# Richmond

EVELYN K. WILSON v. VIRGINIA ELECTRIC AND POWER COMPANY.

March 30, 1933.

Present, All the Justices.

The opinion states the case.

*R. A. Cordell* and *Michael Cooper,* for the plaintiff in error.

*T. Justin Moore, Norman L. Flippen* and *W. H. Venable,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by Mrs. Evelyn K. Wilson, whom we shall call the plaintiff, against Virginia Electric and Power Company, which we shall speak of as the defendant. The object of the action is to recover for personal injuries and property damage which the plaintiff suffered as the result of a collision between an automobile driven by her and a street car operated by the defendant, which collision she alleges was due to the negligence of defendant.

The defenses made by the pleadings were (1) that the defendant was guilty of no negligence which was the proximate cause of the accident, and (2) that the plaintiff was guilty of negligence which was either the sole proximate cause of the accident, or an effective contributing cause thereof.

At the conclusion of the introduction of the evidence for the plaintiff, the defendant moved to strike out all the plain-

tiff's evidence on the ground that it was not sufficient to support a verdict for the plaintiff. The court sustained the motion, and the jury returned a verdict for the defendant upon which the court entered judgment. The only assignment of error is that the court erred in striking out the evidence.

The collision occurred on May 5, 1931, a clear day, about noon, on Monticello avenue, in the city of Norfolk, between Nicholson street and Keen street. Monticello avenue is thirty-two feet wide between curb lines, and runs approximately north and south. Nicholson and Keen streets, which are twenty feet wide between curb lines, enter Monticello avenue from the east. These streets do not extend west of Monticello avenue; and no street enters Monticello avenue between them. About forty-three feet north of Nicholson street, Alexander street enters Monticello avenue from the west, and sixty feet south of Keen street Wilson avenue enters it from the west. These two streets do not extend east of Monticello avenue.

The distance between the center lines of Nicholson and Keen streets is approximately 190 feet. Between these two streets Monticello avenue makes a slight bend or curve, the point of which is sixty-one feet south of the intersection of the center lines of Nicholson street and Monticello avenue. The plaintiff describes this bend as "a sharp bend"; but the plat introduced in evidence shows that it was only a slight bend—that is, the center line of the avenue runs straight from north of Nicholson street to the point of the bend, there it turns to the right through an angle of twelve and one-half degrees, and continues south in a straight line as far south as its course is shown by the evidence.

The street car line along this part of Monticello avenue is a single track line, and is so laid that except at the point of this curve, its western rail north of the point of the curve is fifteen feet three inches, and south of the point of the curve is fifteen feet five inches east of the western curb line of Monticello avenue. But just at the point of the curve

the western rail is between thirteen and fourteen feet from the western curb line.

The plaintiff was driving in her Hudson automobile south along Monticello avenue. The street car involved was going north. The collision occurred, according to the witness Roach, "just about the point of the curve." The plaintiff's testimony on this point is conflicting. Some of her statements seem to place the point of the collision a little north of the point of the curve, while others of them seem to place it a little south of the point of the curve. All her testimony on this point is hereafter given.

At the time of the accident two trucks were parked along the western side of Monticello avenue. The southernmost of these trucks was parked south of the point of collision, with "about ten or twelve inches" between it and the curb. The plaintiff says "I think" this truck was "half block away or one-third block away" from where she was when she saw the street car. But wherever it was, the evidence shows that this truck offered no obstruction to her seeing an approaching street car as far away as Keen street.

The northernmost of the two parked trucks is described by the plaintiff as a "very low truck." The only witnesses who undertake to give the location of this truck are Roach and the plaintiff. Roach testifies that it was parked north of Nicholson street.

The plaintiff's testimony as to the location of the northernmost of the two parked trucks is very conflicting. Her testimony on this point is hereafter given, but the most favorable construction for her that can be placed upon her testimony is that it was parked just at the point of the curve with its rear north of that point and its front south of that point. Her testimony is that her automobile was in "perfect condition," and there is no evidence which tends to show that the street car was defective in any way.

Six witnesses, including the plaintiff, were introduced by her; but only the testimony of the plaintiff and of three other witnesses has any bearing on the question here at issue.

Two of these, Peay and Roach, were riding in a truck which the plaintiff was following. They were eye-witnesses to what took place immediately before and at the time of the collision. The other, Aydelett, an automobile salesman, was called to the scene of the accident by the plaintiff, and did not arrive until about thirty minutes after the collision, when her automobile had been pulled over to the curb.

Aydelett's testimony was to the following effect: All the injury to the automobile was on the "left-hand front corner." "It was not wrecked, but badly scratched," and "its headlight was bent back and the fender bent." The weather was warm and the wheels of plaintiff's car made very plain impressions on the tarred surface of the street. You could see plainly the tracks of all four of her wheels as they came up to the point of the collision. The tracks of both the front and rear left wheels were about eighteen inches inside (east) of the western rail of the street car tracks. Up to the furthest point south to which they extended, they showed no signs of a skid. They were the tracks of rolling wheels. "When there is a four-wheel brake on soft tar, there is a difference between skid and the impression. You can always notice a heavy dark mark when the brakes are applied, and a skid will drag." From the southernmost ends of the tracks above mentioned, there were skid marks running back, northerly, which made an angle to the right with them. These marks were very plain and "showed that at the impact, she had been pushed back six or seven feet * * * from where she stopped going ahead." "I could tell from where the brakes were put on and the car stopped its forward motion, and the drag in the car where it was pushed back six or seven feet."

L. H. Peay was driving a truck south along Monticello avenue. This truck we shall refer to as the Peay truck. The plaintiff was following it at a distance variously estimated by her as being from ten to twenty-five feet, and by the witness, Roach, as from twenty to thirty-five feet. His testimony was to the following effect:

"I didn't see the collision. * * * I was coming down Monticello avenue and meeting a street car along about the same time. * * * I passed one car parked on the right, and there was another further up. * * * Seeing the street car coming, I kind of slowed up, and pulled in to give the street car room to pass. Just as the street car passed I stepped on the gas and started down the street. Just as the back door got alongside of my car I heard the brakes go on and I heard a crash, and I parked and went back, and I saw the lady and the street car had run together." I saw the street car "coming over the hill" when I cut around the first parked car. When I saw the street car coming, I slowed down to a gait that would let it pass before I got to the southernmost parked car. I went back to the scene of the collision and saw some sand on the track. "The sand come up in a pile—not exactly a pile, but looked like it gushed out pretty fast." "Where he started to putting on sand was about a foot from her car." There were two piles of it. "The sand trailed on after the car as far as he went. It looked like he might have gone, after he started putting sand on the track, a foot, or may be two feet." "You could see where the wheel had run through the sand and skidding. He threw on his brake."

With reference to the speed of his truck and that of the street car, Peay's testimony was as follows, all of it being given on his direct examination:

"Q. How fast was that street car coming down Monticello avenue?

"A. I couldn't say.

"Q. Couldn't you approximate it?

"A. I will tell you, I meet so many, and at that time I wasn't paying any attention to how fast he was coming.

"Q. Was he running faster than you?

"A. Yes, sir; because I had slowed down for him to come by.

"Q. What speed were you making when you began to slow up?

"A. I don't know, as I was not watching the speedometer, but I think about fifteen miles, and I think I slowed down to twelve miles.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Q. You say he was going a little faster than you when you first saw him?

"A. Yes, sir. I slowed down to ten or twelve miles an hour, and I expect he was making around fifteen. I can't say about that because I was not driving the car.

"Q. Do you think that he could have been going faster than fifteen miles?

"A. I would not say because I don't know."

The witness Roach was standing up in the body of the truck driven by Peay. He was facing north, leaning against the back of the cab, and holding a large sheet of plate glass. In giving his other testimony we shall avoid repetitions in his statements, except where there may be some shade of difference, when we shall place his several statements on the same point together. We shall also rearrange his statements so as to give them more in accordance with the sequence of events to which he testified. But so far as it is practical to do so, without quoting both questions and answers, or being too verbose, we shall give his testimony in his own words. He testified as follows:

"There were not any [cars] running in front of us." Mrs. Wilson was following our truck. After we had passed a truck parked north of Nicholson street on the west side of Monticello avenue, "this boy [Peay] slowed down," and "I turned around to see what the boy was slowing down for." "There was an automobile sitting on the side \* \* \* and I saw a street car coming." "The street car was one of the 600 type." There was an automobile sitting at the curb in front [of us], and he slowed down to let the street car come by." The street was too narrow for an automobile to pass safely a street car at a point where another car was parked.

"The street car was coming at a pretty good rate of speed."

* * * "I can't tell you" how fast the street car was coming down the street * * * "I can't say whether it was wide open or not." * * * "It was coming at a rapid rate of speed."

The street car was "around about fifty or seventy-five feet" from me when I first saw it. * * * "I saw the car, and I didn't pay any more attention, because I saw the boy driving it [our truck] would not hit it; and I turned around and caught hold of the glass because I didn't want to break it, and I saw the lady behind us start to pull out."

"The street car came past us, and the lady [the plaintiff] driving the Hudson car cut out from behind us. I judge she was following thirty or thirty-five feet behind us, and she cut out from behind us to get around." * * * When she cut out she was "I judge twenty-five or thirty feet [behind our truck], because she stayed about that distance." * * * She "was around twenty or twenty-five feet" back of us when she cut out.

"I don't know whether she saw us pulling to the curb or not. * * * I couldn't say how fast she was running, I don't know." * * * Our "truck was not running at any speed, and was running only between ten and twelve miles an hour, and I felt it slow up." "She saw the street car and stopped, and I judge about the same time the street car man must have seen her and he applied his brakes. She "threw her car in reverse, and about the time she started back the street car came into contact with her and knocked her back four or five feet. The street car man couldn't do any other way. * * * He reversed his car, but it was too late because he was into her." * * * "Her rear wheel was not on the car track, but the front wheel had swung over, and the street car caught her at the right of the left headlight, about middle way of the radiator." "I didn't * * * measure it, but I judge she was twenty-five or thirty feet behind us when she came into the track."

"I turned and looked back, and Mrs., What is her name? driving his Hudson [was] around twenty or twenty-five feet. She pulled out like that [illustrating] and threw the

front wheel on the track. About that time, here [illustrating] sits my truck, and the street car was about alongside of the cab of the truck. I judged that they evidently saw one another about the same time, because I heard him apply the air. * * * it made a hissing sound." * * * "He got so close he reversed the car. I didn't see him do it, but I could tell that he did it because the wheels locked." "When I heard him trying to stop" the street car, it was "about alongside of the cab of the truck, coming right up on her." I don't know how far the street car was from Mrs. Wilson where she stopped, because I was then looking at her car and the street car was behind me.

The collision occurred "just about the point of the curve."

The motorman "was sitting down in the seat provided in the front of the car." "He looked to me like he had both hands in this position [illustrating], and kinder leaning forward. * * * I couldn't say for certain whether he was looking straight ahead, or sideways, or down." * * * "I saw his face, but I couldn't tell which way his eyes were because he wears a cap, and I was higher than the motorman. * * * He was looking down like that, and I was standing up in the truck."

"Q. Did you see the street car slack up at all before the collision?

"A. He did the best he could, I reckon.

"Q. What do you mean?

"A. He slacked up as much as he possibly could. Just like I say, about the time he saw us he might have seen her, because I heard him apply the air, because he got up so close he couldn't stop and he reversed the car, and she was in reverse and had started to back."

The plaintiff testified that she was thirty-one years old and had been driving a car for sixteen years; that the steering wheel of her car was on the left side; that "I was struck pretty hard"; that after the impact the street car "shoved" her car back about six feet; that she frequently had been up and down Monticello avenue; and that she knew that she

might at any place on it meet a street car coming north. Omitting pure repetitions, the rest of her testimony, in so far as it is material to the question here in issue, is given just as she gave it.

*Direct examination.*

"Q. Tell * * * just how the collision occurred.

"A. I was going down town and at Nicholson and Monticello avenue there were three or four cars above me. There were two cars that got out of sight, and then there was a truck and another Hudson. I was the last car in the line going down town. This truck didn't pass the car that was sitting on the side, but the other cars turned out and were ahead. * * * I saw the street car, and he was looking down, and I saw the motorman coming. The street car was seventy-five or 100 feet up the street. The truck slowed down, * * * we were going, I imagine, twenty miles an hour down Monticello avenue. He slowed down, and the truck was parked on the side, and I saw the street car coming, I imagine it was going thirty or forty miles an hour, hustling down, and I don't think the motorman saw me, and I had my left wheel over on the street car track, and I put on the brakes and came to a stop, and it was getting ready to back when the street car came down and hit me.

"Q. How long were you in that position, standing still, before the street car struck you, and where was the street car when you first came to a standstill?

"A. I imagine the street car was about seventy-five to 100 feet away when I first saw it; and by the time I got the car stopped and got ready to back he was right down on me.

"Q. Did you immediately bring your car to a stop?

"A. Yes, I did.

"Q. After your car was struck, what happened to it?

"A. The motorman hit me first. I don't think he saw me until I was standing still.

"Q. Why don't you think he saw you?

"A. I don't know whether he saw me, but I know that is where the sand was, because I got out and looked under there.

"Q. You say you don't think he saw you?

"A. He had his head hanging down, and I don't know whether he saw me. He could have seen if he was looking up, but I saw he was looking down when I got ready to turn out and that is the reason I was backing off the track, and I wasn't going up there because there was another truck parked up there.

*     *     *     *     *     *     *     *     *

"Q. How many parked cars did you see on Monticello avenue?

"A. It was one right where I got ready to turn out, and I think the other was half block away or one-third block away.

"Q. How many cars were in this line?

"A. There is a bend in the street, and we were up above the bend.

"Q. You were north of the bend?

"A. Yes, I was past the bend, and I saw the street car about seventy-five feet away.

"Q. You had gotten south of the bend?

"A. Yes, and this truck was directly above the bend.

"Q. North of the bend?

"A. Yes.

"Q. Was there anything to prevent the street car motorman from seeing you?

"A. No, there was not anything to prevent the street car motorman from seeing me. There was not anything in his way if he looked.

*     *     *     *     *     *     *

"A. I was standing still when he hit me. I had put the lever in reverse and was getting ready to back when he hit me.

"Q. Where was the sand which you say you saw?

"A.   The two piles of sand were right in front of the car, where the car began to shove back my Hudson. * * *   It looked like, after he hit the car, he put the brake on, or something, and the sand came, and I got pushed back." * * *

### Cross-examination.

"Q.   When the truck, which was immediately preceding you slowed up and pulled towards the sidewalk, that necessarily made you slow up, didn't it, or how far behind the truck were you?

"A.   I was fifteen or twenty feet back of him.  I was not right up behind him.

"Q.   If you were fifteen or twenty feet back, and he slowed up and pulled over to the sidewalk, then, instead of turning to your right to the sidewalk for the car to pass you turned to your left.

"A.   Well, there was not anywhere over on that side you could turn out.

"Q.   The truck was coming down ahead of you?

"A.   Yes.

"Q.   It slowed up just before it met this street car?

"A.   Yes.

"Q.   Did you see the truck parked ahead of him.

"A.   Yes, I saw a truck up there.

"Q.   How high a body did the truck have on it?

"A.   It was a low truck.

"Q.   Didn't they have high sides on it, carrying the glass?

"A.   I thought you meant the one that was parked.  I didn't notice the glass in there.

"Q.   But you did notice the truck slow up?

"A.   Yes.

"Q.   And you say you were some fifteen or twenty feet behind it?

"A.   I was about as far as from here to that door, I imagine.

"Q.   You were about twenty-five feet.  When it slowed

up, you came closer to it unless you started to slow up at the same time it did?

"A. After he slowed up on the side, I thought he was going to park; and I noticed this street car come busting down the track, and it didn't look like he saw me.

"Q. Then you pulled to your left instead of pulling to your right, didn't you?

"A. I was going to turn out and pass this other truck [*i. e.* the parked truck];[1] but I knew I didn't have room enough to pass the truck [*i. e.* the Peay truck] and take any chance with the street car, because the street car was coming too fast. * * * I * * * was driving fifteen or twenty miles an hour, and I didn't want to take any chance of getting up there [beside the Peay truck] because the rate of speed that he was coming, I got hit as it was, and the rate that he was coming he would have run over the top of me.

"Q. Your witness * * * said your left front wheel had gotten over the car track?

"A. That is when I started to pass out for the truck. The street car was coming at a rapid rate of speed, and I didn't want to take any chance to pass the two trucks, because, after this truck had to go slow and the other truck was parked, I didn't do anything but stop my car, and as I was in the motion of going back the street car came up on top of me.

"Q. Your position, as you came down the street, was clear of the street car track, because, as Mr. Roach said, at the time of the accident you had just gotten your left front wheel over the car track?

"A. When I stopped and was getting ready to back off the track, the front of my car was up not quite halfway of the truck that was parked on the side of the street.

"Q. What? Do you mean you were halfway past the truck that was parked—the man who stopped in front of you?

---

[1] This and the other matter in brackets are our interpretations indicating our understanding of the witness's testimony.

"A. The man who had the glass, I had just begun to pull around.

"Q. That is true, but you had not gotten up to that truck?

"A. That truck was the second one, and there was that truck that had parked.

"Q. I am speaking of the truck in front of you.

"A. That is the truck that slowed up and was in front of the one that was parked on the side of the street. I did not go past the truck that was parked on the side of the street. This truck here [illustrating],[2] and the one with the glass was about along here, and the street car was coming here, and I had just put my wheel here, and it just passed the tail end of that truck when I saw the street car about seventy-five feet coming.

"By the court:

"Q. The tail end of which truck?

"A. The one that was parked.

"Q. You had passed the truck which was going ahead of you?

"A. No, I never passed that truck that was going ahead.

"By Mr. Venable:

"Q. You didn't pass either one of the trucks?

"A. I didn't pass either one of the trucks.

"Q. Then you were not right behind the truck you spoke of?

"A. I was until he got right to this particular place where the truck was parked, and that is the reason I stopped my car and was going to back, because the truck with the glass was real *slow* up above the other one, and there was a truck parked on the side of the street with no driver. At that time the truck in front of me was close to me.

---

[2] In considering the action of the court in striking out the evidence it must be borne in mind that the court saw the plaintiff illustrate the location of these trucks while this court has not before it what was shown by this and other illustrations made by the witnesses.

"Q. How close did you get up to the truck with the glass in it?

"A. At no time I wasn't closer than fifteen or twenty feet until I got hit.

"Q. Then you got in fifteen feet behind him?

"A. I was not more than ten feet behind him. I don't drive close to a car when I am behind it.

\* \* \* \* \* \* \* \* \*

"Q. See if I have made a mistake in making this memoranda: 'When my car stopped, the street car was right up on me. When I first saw the street car, it was seventy-five feet away?'

"A. I don't remember making any such statement.

"Q. Did you make the statement that when your car stopped the street car was right on top of you, or right at you?

"A. Do you mean when I was getting ready to turn out?

"Q. When you brought your car to a stop.

"A. Yes, when I first looked up the street—

"Q. (Interposing) I want to know how far the street car was from you, not when you first saw it but at the time you got your car stopped, how far was the street car from you?

"A. The only way I can tell you is, coming up to the truck I saw the street car seventy-feet away, and I brought my car to a stop on account of those trucks being there. When I brought my car to a stop it was on a slant, and the trucks was here, and the front of my car was just a little past the tail end of the truck which was stopped. When I first saw the *truck,* it looked like the street car was seventy-five feet away. By the time I put my car in reverse, I had just come to a stop, and by the time I put it in reverse the street car had rushed down on me."

*Re-direct examination.*

"Q. How many cars were parked on the west side of Monticello avenue facing south—how many in front of you?

"A. It was one car, an old truck, a real low-bodied truck, where I was getting ready to turn out.

"Q. Were you turning out from a parked car, or from a moving truck?

"A. No; this truck I was passing was a car that was parked.

"Q. Was it possible for you to pass that parked car without getting on the track?

"A. No, it was not.

"Q. Just in front of the parked car that you were about to pass, what was directly in front of that?

"A. The truck * * * with the glass in it.

"Q. And in front of them was the street car?

"A. Yes.

"Q. Had you reached the moving car, * * * in which Mr. Roach was holding the plate glass * * * when you started to cut out?

"A. No, I had not gotten to it.

"Q. About how many feet were you from Mr. Roach's truck?

"A. From this truck I was about twenty or twenty-five feet, I reckon.

"Q. Did you ever get around that parked car?

"A. No, I did not.

"Q. Why?

"A. Because, as I was up above the one with the glass, there was something else sitting up there on the street— an old Ford, I think, with a top. The street car was coming bursting, and I stopped to wait until the street car passed because it was a narrow street."

The plaintiff then rested and the defendant moved to strike out the evidence. Thereupon, with the leave of the court, the plaintiff again took the witness stand and testified further:

"Q. Where did you have to put your car before you could see the street car?

"A. The bend in the street was just back of me when I

started down Monticello meeting the street car, and you couldn't see the street car approaching until you made the bend. There is a sharp curve there.

"Q. Where was the parked car?

"A. Right immediately above the bend.

"Q. Where, with reference to the parked automobile, did you have to put your car in order for you to see the street car?

"A. I had to pass the tail end of that car, and just as I passed and began to make the turn for the car, I first saw the street car.

"Q. Where did you have to put your car with reference to the street car track before you could see the street car?

"A. I had to turn out to the left and get on the street car track, and when I saw the street car coming that was the first time I could see the car, and I began to back. I couldn't see it until I made the turn."

The plaintiff contends that this evidence is sufficient to support a finding that the defendant was guilty of negligence in all five of the following particulars: (1) The street car was not equipped with proper brakes; (2) the motorman did not keep a proper lookout; (3) he "did not stop it or slow it down when he knew, or ought to have known, that danger of collision with the plaintiff's automobile was imminent"; (4) he was operating the street car at an excessive speed; (5) he did not keep it under proper control. The fifth, however, may be entirely disregarded. Except in so far as it is comprehended in the fourth act of negligence alleged, there is not a scintilla of evidence to support it.

On the other hand, the defendant contends (1) that the evidence is insufficient to support a finding that it was guilty of negligence in any particular; and (2) that the evidence (all which was introduced by the plaintiff) affirmatively shows that the plaintiff was guilty of negligence, which was either the sole proximate cause of the collision, or was, at least, an efficient, contributing cause of it.

When analyzed, the evidence is very weak to sustain

a finding that the defendant was guilty of primary negligence; but in the view which we take of the case it is not necessary to consider whether it is sufficient to sustain a finding of primary negligence or not. Under whatever view may be taken of the evidence, it affirmatively shows, as a matter of law, that she was guilty of negligence which was either the sole proximate cause, or, at least, an effective contributing cause of the accident; and does not present a state of facts to which the doctrine of the last clear chance is applicable.

The plaintiff was familiar with the fact that she was liable to meet a street car coming northward at any place along this part of Monticello avenue. If the motorman could have seen her automobile, she could have seen the street car, and was grossly negligent in pulling over on the track in front of it. If her view of the street car was obstructed by the Peay truck and the parked truck, as she testifies it was, it was her duty to have used reasonable care to ascertain that she could safely move over into the car tracks before she did so.

This she did not do. According to her account of what happened, knowing that the Peay truck and the parked truck cut off her view of any street car that might be approaching, and that their positions prevented her from turning back or going forward to a place of safety, should it be necessary to do so to escape a collision with an approaching street car, while driving at a speed of twenty miles an hour, she cut her automobile over into the car tracks in front of an approaching street car that was not more than seventy-five to 100 feet from her.

We are of opinion that the court did not err in striking out the evidence, and its judgment is affirmed.

*Affirmed.*

GREGORY, J., dissents.
CHINN, J., concurs in result.